Williams, J.
1. The refusal of the court to give in charge to the jury the first instruction requested by the railway company, is made the basis of an extended argument to show that it was denied the benefit of the proper rule of law on the subject of contributory negligence. Whether this is so, depends not only upon the accuracy of the instruction requested, but also upon the effect of the charge given.
The charge requested is as follows :
“ 1. It was the duty of the decedent, to approach the crossing at such a rate of speed as would enable him to stop promptly, to avoid danger, and if the decedent approached the crossing on a trot or at such rate of speed as prevented him from discovering the danger in time to avoid it, or prevented him from stopping promptly, or from turning his horses or as induced him to hurry across upon discovering the danger rather than attempt to stop, then he was guilty of contributory negligence, and the plaintiff cannot recover even though defendant's negligence, also contributed to the injury.''
The Court in its general charge on the subject said to the jury :
“ The deceased was bound to use the same care in protecting himself, that the defendant company was bound' to use, in seeing that no person came to injury by the management of its cars and engines. That is, he was bound to use such care and prudence as a reasonable and prudent man would use, in protecting himself against any injury. It was his duty to use his senses in approaching the railway track, to discover whether or not there was any train or locomotive approaching which might injure him; to make such reasonable use of his eyes and other senses as a reasonable and prudent man would make; and if by the use of them, he could have avoided the injury, then he cannot recover from the company. But if he exercised such care as a reasonable, prudent man would exercise, and if the defendant were guilty of neglect in the running of this engine, and the deceased was killed by reason of that, then the company is responsible.”
And at the request of the company the court further in- ' structed the jury:
*689 “ That it is the duty of the deceased, in approaching the railroad crossing, to look for the railroad locomotive before attempting to cross; and if his failure contributed to the accident, he cannot recover, even though the defendant’s negligence also contributed to the injury.
“ Even though the fireman and engineer were guilty of neglect contributing to the injury, yet that did not absolve the deceased from exercising the precaution of looking and listening for the approach of trains at such point on Ereeman street, as would enable him to discover the approaching train or locomotive ; or from approaching the crossing at such gait as would enable him to control his horses promptly.”
The instructions given to the jury, omitted nothing of substance contained in the one refused, unless it be that “ if the deceased approached the crossing on a trot ” he was guilty of contributory negligence. Indeed the effect of the charge requested is, that it is negligence in law, for a person driving a team to approach at a trot, a railroad crossing under any circumstances.
It is undoubtedly true that persons approaching railroad crossings are bound to the reasonable and prudent exercise of their faculties to discover danger, and to the use of proper care to avoid injury; and, if the omission of either contributes to their injury they are generally without remedy. But whether they have so exercised their faculties and used such care must depend upon the particular circumstance; for instance, it has been held that the absence of the usual signboard of warning is a circumstance which may properly go to the jury to enable them to determine whether the person attempting to cross the railroad track has been guilty of such negligence as would defeat his recovery. The reason assigned is “ that if the traveler is a stranger to the crossing, the want of such warning would be calculated to mislead him into danger; and if he was familiar with the crossing, it might operate as a reminder of danger which he might otherwise forget.” And generally “when the question of contributory negligence depends upon a variety of circumstances from which different minds may ar *690 rive at different conclusions as to whether the plaintiff exercised proper care and caution, the question should be submitted to the jury under proper instructions.” Railroad v. Whitacre, 35 Ohio St. 627.
Approaching a railroad crossing by one driving a team at the speed of a trot, may not necessarily either interfere with the prudent use of his faculties, or prevent due care on his part in crossing. There may be crossings, much .used both by the railroad company and the travelling public, where it would be highly important that persons should cross over promptly and quickly. At the intersection of railroads and highways where trains are run at long intervals, and few persons travel the road, persons approaching, ordinarily can tell whether it is dangerous to cross, and easily govern their own conduct in crossing. But where several tracks, over which trains and engines are run many times every hour, cross a constantly traveled public street in a populous city, thronged with people and vehicles, unless some expeditious mode of crossing were devised, a confused and hopeless obstruction of the street would result. Hence, at such crossings gates are put up and gatemen maintained by railroad companies, as was the case at the crossing in question, as a means of safety to the people using the street and for the protection of the railroad companies. It is the business of the gatemen to watch the track, and when clear, to open the gates for persons using the street to cross; and upon the approach of locomotives or trains to close the gates and prevent persons and vehicles from crossing until the tracks are again clear. To persons in the street who are approaching the railroad tracks with a view to crossing, an open gate is notice that the track is clear, and that it is safe to cross; but as the gates were liable to be closed at any time, persons crossing would naturally understand they should not linger on the track, but pass over promptly and speedily. Therefore, for a person to drive in a trot onto the railroad tracks while the gates are open, instead of being negligence, might be- a high degree of care.
The evidence in this case very clearly shows that Freeman *691 street, at the point it was crossed by the railroad tracks, was a public street of the city of Cincinnati, over, which people and teams of all kinds were constantly passing; that several tracks of the railroad were laid across it, which were by two compapanies used for shifting their cars and locomotives, and gates had been put up, and gatemen were maintained at the crossing; that at the time the deceased approached and drove onto the crossing the gates were open, and he drove onto the tracks through the open gate on a trot; and we think the court properly left it to the jury to determine whether the deceased under the circumstances of the case, used such care as a reasonable and prudent person would and ought; and the refusal of the court to charge the jury that he was guilty of contributory negligence, if he approached the crossing on a trot, was not error.
2. It is next contended that there was error in refusing to instruct the jury that:
“ If the jury find, that the gateman was an employe of the Cincinnati, Hamilton & Dayton Railroad Company, and under its control, and operated the gates while the trains of the defendant were passing, simply as the servant of the first-named company, then the defendant could not be charged with his negligence, unless after discovering his negligence it could by the exercise of ordinary care have prevented the effect of such negligence;” and in the charge given on that subject, which is as follows :
“There is one thing further which is to be said about the question as to the agents of the defendant. It is claimed that the defendant is not liable for the acts of the brakesman, gatekeeper, and perhaps other employes, because they were employes of the Cincinnati, Hamilton & Dayton Railroad Company, and not the employes of the defendant company. “If you find from the testimony, that the defendant, the Cleveland, 'Columbus, Cincinnati & Indianapolis Railway’ Company was occupying the tracks of the Cincinnati, Hamilton & Dayton Railway Company by an agreement between the two companies; that the engine which caused the injury, was the engine of the defendant company; and that the *692 switch-men, gate-keepers, train dispatchers, and other officers and agents of the Cincinnati, Hamilton & Dayton Company, were, by reason of this agreement engaged in running, or aiding to run the locomotive of the defendant company, then, for the purposes of the movements of that locomotive on the track of the Cincinnati, Hamilton & Dayton Company, the officers and agents of the Cincinnati, Hamilton & Dayton Company engaged in that work, were the officers and agents of the Cleveland, Columbus, Cincinnati & Indianapolis Railway Company.”
It appears from the record that a contract was made between the Cincinnati, Hamilton & Dayton Railroad Company and the Cleveland, Columbus, Cincinnati & Indianapolis Railroad Company, in 1876, the seventh section of which only was put in evidence, and which reads as follows :
“ Seventh. The business of said two lines ®f railroad shall be conducted so as to preserve the existing relations of each with eastern and western connecting roads, and to develop to the fullest extent the business resources of each line; all passenger trains shall be run to and from the Cincinnati depot, party of the first part, and for the use of the same, with the tracks, side tracks thereto and yards for passenger cars west of Millcreek, and for the cost of switching, the party of the first part, shall be allowed and paid by the party of the second part, in excess of the amount to which each shall be entitled out of the joint earnings, annually the sum of five thousand dollars, payable monthly.”
There was evidence tending to show that the gate at the Freeman street crossing was put up by the former company, and that the gateman was employed by that company, but the engines and trains of the latter company were run and controlled by its own servants and employes, and that the engine which collided with the wagon of the deceased when he was killed, was-4o run and controlled; and as the negligence charged against the defendant by the plaintiff in her petition consisted in carelessly running the locomotive and managing the crossing, it became a material question whether the defendant, could be made responsible for any negligence of the gate- *693 man while it was using and operating the railroad. The whole of the agreement between the two companies is not produced, and it was impossible for the court from the fragment that was introduced in evidence to construe it, or properly determine its effect or the relation really existing between the companies. From that part of the contract contained in the record, it appears that each company had the right to the equal and joint use of the tracks and depot, and the defendant was to pay the other company for the use of the same with the side tracks and yard, and for the cost of switching, five thousand dollars per year in excess of the amount to which it should be entitled out of the joint earnings. "What the arrangement was in regard to the servants or employes of the two companies is not shown. Whether they were to be paid out of the joint earnings, and be under the joint control of the two companies or otherwise, does not appear from that part of the agreement in the record; and the evidence on the subject consisted of the usage and conduct of the companies. It would seem, therefore, that the court properly left it to the jury to determine as a question of fact, whether the defendant was using the tracks of the other company under an agreement with it, and the gate keeper and other employes of that company were, by reason of the agreement, aiding to run the locomotive, of the defendant which caused the injury. If so, they became, by virtue of the agreement, the servants and employes of the defendant, and it became liable for their negligence. The fact that the gateman was an employe of the Cincinnati, Hamilton and Dayton Railroad Company, and was under its control and so operated the gates while the defendant’s trains were passing, does not exclude the idea that by virtue of the agreement between the two companies, he may also have been then equally under the control of the defendant.
But we do not care to rest the decision of this question solely or mainly upon the foregoing considerations. It is generally held that railroad companies, unless required by statute, are not bound to place gates or flagmen at highway crossings, except under special circumstances which render the *694 precaution necessary for tbe public safety. The duty, it is said, does not arise merely from the number of persons who use the crossing, but it may be created by an exceptionally dangerous mode of crossing adopted by the companies for their own convenience. Peirce on Railroads, 352 and cases cited.
“A railway company is not as a rule, in the absence of a statute requiring it, or of an ordinance of a municipal corporation, bound to maintain gates at a crossing, or keep a flagman there to warn travellers of the approach of trains. But under the maxim sio utere tuo, etc., instances may arise where this duty is cast upon them, or of providing some other equally safe mode, by reason of the location of the crossing, and the large number of people crossing it, or where the mode of crossing adopted by the company is exceptionally dangerous.” 2 Woods Railway Laws, 1313.
And in Pennsylvania R. R. Co. v. Matthews, 36 N. J. L. 531, the chief justice, in delivering the opinion of the court, said: “ Under usual circumstances, in the open country, they (railway companies) can run as many trains, and at as groat a rate of speed as are consistent with the safety of their passengers. They are not called on to keep flagmen, under ordinary circumstances, at cross-roads, nor to give any other notice of the approach of their trains than those signals that are prescribed by statute. If greater safe-guards .are requisite for the safety of the community, and those public agents are to be put under greater restrictions in the exercise of their franchises, such contrivances must proceed from the legislative, and not from the judicial power. But while I thus say that these additional burthens cannot be imposed by the courts upon these companies, I also say, at the same time, and with quite as much emphasis, that the companies may, by their own conduct, impose such burthens on themselves. If one of them chooses to build its track in such a mode as to unnecessarily make the use of a public road which it crosses, greatly dangerous, I think such company, by its own action, must be held to have assumed the obligation of compensating the public for the increased danger, by the use of additional safeguards. The reasonable and indispensable implication is that the railway is *695 to be constructed so as not unnecessarily to interfere with the safe use of the public roads; and if a railroad for its own convenience curves its track, as it leaves a deep cut within a few feet of a highway, and also sees fit to put up buildings close along such track, and by these means, or either of them, heightening the danger in the use of such highway, it seems to me very clear, that such company must be held to have taken upon itself the duty of averting such danger, by the employment of every reasonable precaution within its power. On such occasions as this, or whenever the situation is embraced within the principle stated, the presence of a flagman, or some equivalent safeguard can be demanded of the company.”
The crossing in question has been recognized by the railroad companies using it, as of that exceptionally dangerous character, made so for their convenience in using the tracks as a place for switching cars and locomotives, which ' created the duty to place gates and gatemen there as a necessary precaution on their part, and we think very properly so; for when a railroad company for its own convenience, lays its tracks across a generally travelled public street in a populous town or city, over which people with their teams and vehicles are accustomed to pass almost continuously, and then uses the tracks as a place for the convenient switching of trains and engines, thus making a.yard of a portion of the public street, it is bound to exercise care proportioned to the increased danger arising from such use of its tracks, to avoid injury to persons using the crossing; and common prudence requires that it should, as a reasonable precaution for their safety, and means of preserving the legitimate uses of the street, maintain flagmen or gates and gatemen at such crossing, or adopt other adequate measures for that purpose; otherwise, the street may be permanently obstructed and its uses destroyed.
So long as the defendant used the railroad tracks at this crossing and operated the road, it was incumbent on it to use like care. It should anticipate the reasonable effect of the gates, and the gatemen’s conduct in their managment, on persons approaching the crossing, or about to cross, and operate the road *696 at that place, having due regard to such probable effect, and exercise care proportioned to the probable danger to persons using such crossing under those circumstances; and if while so using the tracks of the road, it accepts the services of the gatemen employed by the company owning the road, instead of employing gatemen of its own, they become, for the time being, its servants, for whose negligence it is responsible; and if it does not accept their services, its duty is to place competent gatemen there, and is responsible for its omission to do so. It might by proper stipulation in the agreement of the railroad company with which it contracted*, require it to furnish competent servants for the transaction of its business, and hold it responsible for any breach of the agreement; but it cannot by such contract, or by its failure to so contract, shift either the duty it owes to those using the street, or its responsibility to them.
3. The refusal of the court to give the third instruction requested by the defendant is also one of the errors assigned. That instruction is that :
“ If the jury find from the evidence, that at a point on Freeman street, twenty-five feet from the track upon which the locomotive that caused the injury was coming, the decedent seated in his wagon could, by looking in the direction of the approaching locomotive have seen it at a distance of one hundred and fifty feet, or more, from the crossing, and in time to avoid the collision, his failure to discover its approach was negligence on his part, and the plaintiff cannot recover.”
It is said in the argument that this instruction is adopted from Bellefontaine Ry. Co. v. Snyder, 24 Ohio St. 678.
The instructions requested and refused in that case were, that if the plaintiff’s daughter, who was killed, and her sister who was accompanying her, could, by looking, have seen the train and avoided the injury, their attemptto cross without looking was negligence; or, if they were standing on the track without looking to see if a train were approaching, if they could have seen the danger and avoided the injury by looking, that was negligence. This court in declining to reverse the judgment because of the refusal to give the instructions requested said : “ While *697 we think the court erred in refusing a new trial on the ground that the verdict is against the weight of the evidence, we see no error in its refusal to give the instructions asked. To give the instructions asked would have been to a great extent, taking the case from the jury by assuming the existence of material facts in the case. The court could not say to the jury that the failure of the girls to look in the direction of the gravel train when approaching or standing upon the track was carelessness such as should prevent a recovery without assuming the existence of material facts in the case which it was for the jury to find. The instructions asked assume the agency of the elder sister, and assume the non-existence of any facts or cirsumstances rendering it prudent or proper for her to omit looking out. These were matters for the jury, and could not be found or assumed by the court, no matter how plainly they might be proven.”
These observations apply aptly to the instruction now under discussion. It assumes that there were no other facts or circumstances in the case which might properly enter into the question of contributory negligence, and in effect excluded from the jury in its consideration of the question, the fact that gates were maintained at the crossing, and stood open in the presence of the gateman having control, thus signifying a clear track and amounting to an invitation to those about to cross over to do so. Then there was evidence tending to prove that there were at least four tracks crossing Freeman street at the point in question, used by both railroad companies for switching and shifting locomotives and cars. These tracks intersected at different places, so that the passing of engines along them in the direction of the crossing, and one hundred and fifty' feet away, was not always an indication that they would pass the crossing; and the fact that the gates remained open might easily create the belief by persons ordinarily prudent, that they would not be run to the crossing. At least this was a proper circumstance for the jury in determining whether the deceased exercised proper care, and the instruction requested virtually excluded it from their consideration; and, we think there was no error in refusing it.
*698 4. The only other instruction requested by the defendant, which was refused, is the following :
“ If there were obstructions to the decedent’s line of vision in the direction from which the locomotive was coming, that fact made it the more necessary that he should use other means to discover danger, and if he could not avoid danger otherwise than by stopping and listening, then it was his duty before going upon the track to stop and listen, and if his failure to do so contributed to the injury, plaintiff can not recover.”
Much of what has already been said is also applicable to the question raised by this request. As before remarked, persons approaching railroad crossings are bound to the reasonable use of their faculties in discovering and avoiding danger from passing trains, and to that end, it is ordinarily their duty to listen, and if necessary, stop before attempting to cross; but at crossings where gates are maintained, this may cease to be a duty, or be so only under peculiar circumstances, though the view of the track is obstructed. The placing of gates and gatemen at the crossing may have become but a prudent and proper precaution on the part of the railroad companies because of the obstructed view of the tracks, and the difficulty on the part of persons approaching in discovering danger from observation merely. At such crossings, it is the duty of the gatemen to observe the tracks, and to know when, on account of approaching trains and engines, it becomes dangerous to cross, and whenever it docs, to close the gatos and prevent persons from attempting it; and it is as much their duty to observe and know when the tracks are clear, and persons may cross over in safety, and when it is, to open the gates and keep them open for that purpose so long as it continues to be safe to cross, and no longer. Persons approaching such crossings have the right to presume, in the absence of knowledge to the contrary, that the gatemen are properly discharging their duty, and govern themselves accordingly, and it is not negligence on their part to act on the presumption that they are not exposed to dangers which can arise only from a disregard by the gatemen of their duties; and hence, when the gates are open and the gatemen present they are entitled to assume that the tracks are *699 clear and it is safe to cross, and their failure to stop and listen before passing onto the tracks through the open gate, is not, in the absence of other circumstances, negligence which will, in case of injury to them, caused by a passing locomotive while so attempting to cross, defeat a recovery therefor. This conclusion is sustained by the case of Baker v. Pendergast, 32 Ohio St. 494, where it is held, that “ a person about to cross a street of a city in which there is an ordinance against fast driving has a right to presume, in the absence of knowledge to the contrary, that others will respect and conform to such ordinance; and it is not negligence on his part to act on the presumption that he is not exposed to a danger which can only arise through a disregard of the ordinance by other persons.”
It is true that it is further held in that case “ that, if the person crossing the street knew that persons were driving along the street at a forbidden speed, and had full means of seeing the rate at which they were going, the existence of the ordinance would not authorize a presumption which was negatived by the evidence of his senses.”
The instruction requested by the defendant now under consideration assumes that the deceased (Schneider) did not see the approaching engine, and could not on account of obstructions to his “ line of vision in the direction from which the locomotive was coming,”, and therefore, that it was his duty to use other means to discover the danger, and, if necessary, to stop and listen. In the case assumed by the instruction the presumption upon which he had a right to rely, viz.: that the gatemen were properly performing their duty, and the track was clear, was not negatived by the evidence of his senses or in any other way.
5. The last assignment of error we notice is that based upon the alleged misconduct of the plaintiff. It appears from the bill of exceptions that a drawing prepared by one of the witnesses, of an engine and the crossing, was admitted in evidence on the trial, and was taken with the papers by the jury on the submission of the case. The misconduct consisted in writing on the back of this paper by one of the plaintiff’s *700 counsel what is characterized by defendant’s counsel as “points and suggestions.” If not entirely unintelligible, they are so meagre and obscure as to render it doubtful whether any person except the one who wrote them could make any intelligent interpretation of them, or derive any significance from them. It appears that they were memoranda written while the counsel for the defendant were making their arguments to the jury, by one of the plaintiffs’ counsel as points to be answered by him in the closing argument. He did not at the time know that they were being made on a paper in the ease, and it appears that they were not made with any intention to have them go to the jury, and neither the plaintiff nor her counsel knew the jury had them. The delivery of the paper to the jury was attended by no wrongful conduct on the part of the plaintiff or of her attorneys, and the trial court, familiar with the progress of the trial and the conduct of the jury was better able than wc, to judge whether the defendant could have been prejudiced thereby. At all events we do not regard it a matter of such consequence as to require the reversal of the judgment.
Some other errors are assigned, but they are substantially disposed of by what has already been said and they need not be more particularly noticed.

Judgment affirmed.